UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | |
|---|---|
| RUBEN LOZOYA § | |
|    Plaintiff § | |
| § | CIVIL ACTION NUMBER |
| v. § | M-03-192 |
| § | |
| JO ANNE B. BARNHART § | |
| COMMISSIONER OF § | |
| SOCIAL SECURITY § | |
|    Defendant § | |

**MEMORANDUM OPINION**

    Plaintiff Ruben Lozoya filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of the Social Security Administration's (Commissioner) denial of Plaintiff's application for Supplemental Security Income (SSI) under section 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Docket No. 22.) Pending before the Court are the parties' cross-motions for summary judgment. (Docket Nos. 17 (Plaintiff), 18 (Defendant).)

    In reviewing the Commissioner's denial of benefits, a federal court may not re-weigh the evidence or substitute its judgment for that of the Commissioner's; rather, a court's review is limited to whether the Commissioner applied the proper legal standards and whether the decision is supported by substantial evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). After carefully considering the record in light of the deferential standard of review that applies, and for the reasons discussed below, the Court finds that there was no reversible legal error and that the Commissioner's decision is supported by substantial evidence, which includes multiple assessments by consulting physicians, medical reports by examining physicians, and Plaintiff's own testimony. Accordingly, summary judgment will be granted in favor of the Commissioner.

# I. <u>BACKGROUND</u>[1]

Plaintiff filed an application for SSI in October 2000, alleging that he became unable to work in July 2000 due to diabetes mellitus, poor circulation, arthritis, and hypertension. (Tr. 105.) Plaintiff's application was denied initially and on reconsideration. (Tr. 67–72, 75–77.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on November 14, 2002 in McAllen, Texas. (Tr. 78–86.) Following the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled within the meaning of the Social Security Act and not entitled to any period of SSI payments. (Tr. 17–25.) Plaintiff's request for review of the ALJ's decision by the Appeals Council was denied on June 20, 2003. (Tr. 8–10.) In filing this action, Plaintiff seeks review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Plaintiff was 48 years old, with a second grade education obtained in Mexico. (Tr. 33.) He speaks only Spanish and testified at the hearing with the assistance of an interpreter. His past work experience includes employment as a vegetable harvest worker and aloe vera worker. (Tr. 33–34.)

## A.   The Medical Evidence[2]

Plaintiff's first medical records date from the middle 1990s, though the notes to these initial visits are nearly indecipherable. (Tr. 326.) From that time through the administrative hearing, Plaintiff remained under the care of Dr. John J. Dominguez. The first mention of diabetes mellitus

---

[1] The Commissioner has filed a transcript of the entire record of the administrative proceedings, which will be cited herein as "Tr."

[2] Because the Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence, the medical evidence will be summarized in some detail. *See Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

is found in Plaintiff's February 3, 1997 visit to Dr. Dominguez. (Tr. 327.) Throughout the remainder of 1997, Plaintiff apparently made follow-up visits with Dr. Dominguez on the diabetes issue. (Tr. 321–26.) In December 1997, a venous outflow study performed at the direction of Dr. Dominguez revealed that Plaintiff's circulation in his legs was normal, suggesting that the veins in the legs were unobstructed. (Tr. 318–19.)

In June 1998, Plaintiff went to see Dr. Dominguez complaining of chest pain arising from a fall. (Tr. 309.) Dr. Dominguez ordered chest X-rays and other tests, which revealed no abnormality in Plaintiff's heart, lungs, or ribs. (Tr. 311.) Dr. Dominguez sent Plaintiff a letter in September 1998, indicating that Plaintiff suffered from diabetes mellitus and poor circulation and that he was in danger of dying if he did not take his medications. (T. 307.)

On December 29, 1998, Plaintiff was evaluated by Dr. Robert Pardo at the request of Disability Determination Services (DDS). (Tr. 298–305.) Plaintiff informed Dr. Pardo that he had first been diagnosed with diabetes and hypertension in 1988, though he could not recall the symptoms he was having that led him to go to a doctor. Plaintiff also indicated that he had suffered from arthritis in all his joints since 1993, especially in cold or rainy weather, though he exhibited no difficulties in grasping or manipulating objects during the visit. Plaintiff also complained of other ailments, including headaches, dizzy episodes, tingling in his hands, and various gastrointestinal problems. Dr. Pardo examined Plaintiff and noted nothing out of the ordinary with regard to Plaintiff's neck, chest, lungs, heart, abdomen, or neurology. Dr. Pardo indicated that there was some tenderness in the spine, but that it did not inhibit Plaintiff's range of motion. The doctor also noted that he did not see any increase in temperature, redness, or swelling in Plaintiff's lower extremities. Dr. Pardo concluded that Plaintiff did not suffer from any significant limitation regarding his sitting,

standing, moving about, hearing, or speaking, and that there was no muscular atrophy. X-rays taken in conjunction with this visit were all negative as to problems in the heart and lungs.

On January 21, 1999, Dr. Daniel H. Spoor completed a Residual Functional Capacity Assessment in connection with an earlier claim submitted by the Plaintiff. (Tr. 289–96.) Dr. Spoor found that Plaintiff could lift fifty pounds occasionally, twenty-five pounds frequently, stand or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and was unlimited as to his ability to push or pull. Dr. Spoor noted no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. He concluded that Plaintiff's disability allegations were not fully credible and not supported by objective evidence.

An ophthamological exam was performed at the request of DDS in 1999. The condition of Plaintiff's eyes suggested that he suffered from diabetes, but they showed no sign of retinopathy. (Tr. 285–86.)

Plaintiff was next examined by Dr. Dionisio B. Calvo on October 6, 1999, also at the request of DDS. (Tr. 281–284.) Plaintiff complained of hypertension with symptoms of nausea and vomiting, though he could not tell how often this occurred. He also complained of having suffered a heart attack after he had fallen down; however, he did not suffer from chest pains, shortness of breath, palpitations, pedal edema, paralysis, or evidence of heart failure. It was noted that Plaintiff had not taken any medications for over a year, though he did present Dr. Calvo with empty bottles of Glyburide, Naprosyn, metronidazole, and Glucotrol XL. Plaintiff also complained of being diabetic for thirteen years, but Dr. Calvo noted that Plaintiff showed no symptoms of diabetes and had never been hospitalized for any problems relating to diabetes or hypertension. After a thorough

examination, Dr. Calvo's findings included the following: Plaintiff exhibited no evidence of end-organ damage associated with his alleged diabetes and hypertension; and, while Plaintiff suffered some arthritis, no deformity or muscular atrophy were present and Plaintiff was able to button his clothes.

A second Residual Physical Functional Capacity Assessment was completed on October 26, 1999. (Tr. 272–80.) The findings in this assessment were virtually identical to the previous assessment by Dr. Spoor, both concluding that Plaintiff's alleged disabling limitations were not fully supported by medical evidence. The evidence on which the October 1999 assessment was predicated was later reviewed by Dr. John R. Wiley, who affirmed the assessment as written. (Tr. 280.)

Plaintiff returned to Dr. Dominguez in June 2000. Based on Plaintiff's complaints of hematemesis and intermittent rectal bleeding, Dr. Dominguez referred him to the Knapp Medical Center on June 27, 2000. (Tr. 270–71.) An esophagogastroduodenoscopy was performed, and there were no signs of problems in Plaintiff's esophagus, stomach, or duodenum. Plaintiff also underwent a colonoscopy at the Knapp Medical Center on June 30, 2000. (Tr. 268–69.) The findings were that Plaintiff was essentially normal.

Plaintiff continued treatment with Dr. Dominguez through September 2000. (Tr. 240–49.) Dr. Dominguez consistently diagnosed Plaintiff with diabetes mellitus and peripheral vascular disease, though it was also noted that Plaintiff continually failed to take his medications. Plaintiff weighed 175 pounds on July 7, 2000, 179 pounds on August 10, 2000, and 186 pounds on August 30, 2000. There is little change noted between any of Dr. Dominguez's records relating to Plaintiff, and they are all equally difficult to decipher.

A third Residual Physical Functional Capacity Assessment was completed by Dr. Bonnie Blacklock on March 9, 2001. (Tr. 233–39.) This assessment indicated that Plaintiff could lift up to fifty pounds occasionally, twenty-five pounds frequently, stand for at least two hours in a workday, sit for six hours in a workday, and was unlimited in his ability to push or pull, except as otherwise indicated. No postural, manipulative, visual, communicative, or environmental limitations were noted. Dr. Blacklock summarized Plaintiff's medical history of diabetes, hypertension, and arthritis. She also noted that the medical records showed that his blood pressure was never above 120/60, his weight never above 184 pounds, and that he was now on insulin. She concluded that the alleged limitations in function, though partially credible, were not totally supported by the medical evidence.

On June 1, 2001, Plaintiff was seen by Dr. Calvo, who again examined Plaintiff at the request of DDS. (Tr. 219–24.) At this visit Plaintiff complained of pain all over his body, though it was noted that he was very vague and inconsistent when asked where his pains were located. Plaintiff explained that he had experienced blindness for four hours a few months earlier, but he did not see a doctor about this and did not seem upset or worried by it either. Plaintiff stated that the last time he saw a doctor for his diabetes was one year earlier. Plaintiff complained of chest pain all over his chest area that lasted for days on end and had been occurring for several years. His remedy for the pain, as described to Dr. Calvo, was to run for about thirty minutes in order to get some air. Dr. Calvo's physical examination revealed that Plaintiff was 5' 4" tall and 178 pounds with blood pressure of 140/74. All sensory function was good, and he had good muscle tone and strength. His vision was rated at 20/10 in both eyes, 20/10 in the left eye and 20/15 in the right. Dr. Calvo noted that Plaintiff exhibited disproportionate reaction of pain when touched in the lumbar area; on a

Waddell's maneuver, Plaintiff elicited disproportionate and nonphysiologic response consistent with a person with "symptom augmentation." (Tr. 221.) Dr. Calvo's overall impression was of diabetes mellitus without any evidence of end-organ damage, chest pains reproducible on pressure to the sternum, though not angina, and polyarthralgia without any evidence of deformities or atrophy.

Plaintiff next presented himself at the Knapp Medical Center emergency room on July 18, 2001, complaining of abdominal pain that had occurred off and on for the last five months. (Tr. 345.) Plaintiff indicated that the day before his visit he developed a fever and that the pain was worsening, though he denied any chest pain. His temperature was 103 degrees with a blood pressure of 140/60. Plaintiff was placed on intravenous fluids as well as empiric antibiotics. After further examination, it was decided that Plaintiff was suffering from infectious colitis. A colonoscopy was performed showing inflammation in the transverse colon, and a biopsy was taken. (Tr. 346.) On July 21, 2001, Plaintiff was discharged home in stable condition. It was noted that he had no further problems, that his colitis was resolving, and that his blood sugar was controlled. Plaintiff was told to maintain a lactose free diet, to engage in activity as tolerated, and to continue his medication and insulin.

Plaintiff presented himself to Dr. Dominguez on October 16, 2001, complaining again of abdominal pain. (Tr. 340.) His weight was 182 pounds and blood pressure was 120/70. After a colonoscopy, he was again diagnosed with colitis, given a course of Asacol, and told to follow up in a few weeks. (Tr. 341.) The follow-up visit occurred on October 25, 2001, where another colonoscopy was performed and findings were normal. (Tr. 338.) Plaintiff was also treated by Dr. Dominguez in November 2001 for what appeared to be the flu and abdominal pain. (Tr. 334.) This appears to be Plaintiff's last record of medical treatment.

Almost a year after Plaintiff's last documented doctor visit, on September 19, 2002, Dr. Dominguez completed two forms for Plaintiff regarding his residual functional capacity (RFC).[3] (Tr. 357–64.) On the first form, entitled "Diabetes Mellitus Residual Functional Capacity Questionnaire" (Tr. 357–60), Dr. Dominguez indicated that Plaintiff's prognosis was "Fair." However, Dr. Dominguez felt that Plaintiff was incapable of performing even low-stress jobs, could not walk more than half a city block, could sit for only thirty minutes at a time, could stand for only fifteen minutes at a time, could sit for four hours in a regular workday, and could stand for less than two hours in a regular workday. Dr. Dominguez indicated that Plaintiff would need to take unscheduled breaks during the day; however, he did not respond to questions about how often these breaks would occur or how long they would last. Dr. Dominguez also indicated that Plaintiff could never lift more than twenty pounds, could rarely lift up to ten pounds, and could rarely twist, stoop, crouch, climb ladders, or climb stairs in a regular workday.

On the second form, entitled "Obesity Residual Functional Capacity Questionnaire" (Tr. 361–64), it was noted that Plaintiff was 5' 7" tall,[4] weighing 193 pounds. Dr. Dominguez again noted that Plaintiff could not lift more than ten pounds on an occasional or frequent basis. However, this time he indicated that Plaintiff could stand for four hours in a workday and sit for two hours in a workday (the opposite of what he had indicated in the first questionnaire).

---

[3] While the Commissioner's brief indicates that this RFC assessment was completed in 2001, the ALJ's opinion states that it occurred in 2002. (Tr. 22.) Because the dates on the forms are illegible, the undersigned defers to the date indicated in the ALJ's decision.

[4] It should be noted that Plaintiff's actual height seems to be 64 inches, or 5' 4", as reflected in numerous other medical records. (Tr. 335, 340.)

**B.      The Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing held on November 14, 2002. Plaintiff testified (Tr. 32–40), along with Dr. Don Marth (Tr. 40–43), the vocational expert.

Plaintiff testified that he was forty-eight years old, that he had completed the second grade in Mexico, and that he had not worked for five to seven years. He testified that the most he had to lift in his previous work as a vegetable harvester and aloe worker was fifty pounds; however, he indicated that he stopped working because of his arthritis and diabetes. Plaintiff stated that he felt dizziness and headaches in association with his diabetes for three to four years and that his vision was blurry and painful for the past three years. He also said he experienced numbness in his leg for the past two years, as well as pain in his chest, abdomen, arms, and burning in his groin. He stated that he could not lift his arms above shoulder level because of the pain in his back.

Plaintiff indicated that he did not sleep very well, that he would get up around six o'clock in the morning to move around and catch his breath, and that his pain and dizziness would worsen throughout the day. He testified that he took insulin every day and that he was being treated by Dr. Dominguez every month. He stated that he could not walk very far because of pain in his neck and stomach. He also indicated that he went to an adult daycare center three to four times a week for recreation. When asked by his attorney how much he could lift, he testified that he could lift about fifty pounds. But when questioned further, he stated that the last time he had lifted fifty pounds was when he worked in the aloe fields. His attorney also asked him how much he could lift now, and Plaintiff testified that the day before he had picked up a lawnmower out of the yard after he cut the grass. Plaintiff then added that he felt very tired and weak in so doing.

9

He testified that he could see straight ahead, but not clearly on the sides. He also testified that he did not have any chores around the house other than mowing the grass, that he had difficulty bathing and dressing himself, and that he did not go anywhere, only staying at home with his mother.

Next, the vocational expert, Dr. Marth, testified that all Plaintiff's previous work was at a medium exertion level and generally unskilled. (Tr. 40–43.) Dr. Marth was then confronted by Plaintiff's counsel with the RFC assessments completed by Dr. Dominguez and asked what types of work Plaintiff could do according to Dr. Dominguez's analysis. Dr. Marth responded that no work in the competitive workplace existed for a person with the limitations described in Dr. Dominguez's assessment, given that all jobs have some stress level. Dr. Dominguez had indicated that Plaintiff could not tolerate any amount of stress.

C.   **The ALJ's Decision** (Tr. 17–25)

In making his decision, the ALJ relied on the testimony that was presented at the November 2002 hearing and the other medical evidence in the record. The ALJ recited and then applied the five-step method for evaluating disability claims.[5]

The ALJ first noted that there was no evidence that Plaintiff had engaged in substantial gainful activity since making his claim. This finding allowed the ALJ to move to the second step of the evaluation, which is whether Plaintiff had an impairment or combination of impairments that were "severe" within the meaning of the Social Security Regulations. 20 C.F.R. § 416.920(c). The ALJ then spent two pages discussing Plaintiff's medical records, ultimately concluding that Plaintiff had two severe impairments, diabtetes mellitus and obesity. No other severe impairments or

---

[5] The five-step process is further explained later in this report in the Standard of Review section.

combination of impairments were noted. The ALJ noted that X-rays had revealed evidence of mild degenerative joint disease, but he ultimately concluded that there was no evidence in the record to indicate that these impairments (polyarthralgias/polymyalgias) imposed significant limitations on Plaintiff's ability to perform work. In support of this conclusion, the ALJ cited to physical examinations showing normal motor strength, muscle tone, and ranges of motion, and to the absence of edema or swelling. The ALJ also found Plaintiff's complaints of polyneuropathy and peripheral vascular disease to be lacking medical support.

At the third step, the ALJ concluded that Plaintiff's impairments were not severe enough, either singly or in combination, to meet or medically equal one of the impairments in the Social Security listings. This finding necessitated a determination of Plaintiff's residual functional capacity to perform the requirements of his past work or other work existing in significant numbers in the national economy. The ALJ again turned to the medical evidence and concluded that the objective medical findings were inconsistent with Plaintiff's allegations of disabling impairment. The ALJ also concluded that the opinions offered by Plaintiff's treating physician, Dr. Dominguez, were "internally inconsistent with one another, [...] unsupported by objective findings [...], and, [...] contrary to the opinions of other physicians." (Tr. 22.) The ALJ determined that Plaintiff retained a residual functional capacity for medium work, and he ultimately found that Plaintiff could return to his work as a harvest worker (as that job is generally performed). Thus, the ALJ found that Plaintiff was not disabled.

**D.     Procedural History**

On April 16, 2003, Plaintiff sought administrative review of the ALJ's determination. (Tr. 8.) The Appeals Council concluded that there was no basis for challenging the ALJ's decision,

rendering it the Commissioner's final decision for purposes of judicial review. The instant action followed. (Docket No. 1.) The parties have filed cross motions for summary judgment. (Docket Nos. 17, 18.) After the parties consented to proceed before a United States Magistrate Judge, this case was referred to the undersigned. (Docket No. 22.)

## II. ANALYSIS

**A.     Standard of Review**

To qualify for SSI under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that he is disabled.[6] The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)     whether the claimant is currently working in substantial gainful employment;

(2)     whether the claimant suffers from a severe impairment;

---

[6] Title II of the Act provides for federal Disability Insurance Benefits for the disabled, while Title XVI provides for SSI. "The relevant law and regulations governing the determination of disability under a claim for Disability Insurance Benefits are identical to those governing the determination under a claim for [SSI]." *Davis v. Heckler*, 759 F.3d 432, 435 n.1 (5th Cir. 1985).

    (3)    whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

    (4)    whether the claimant is capable of returning to his past relevant work; and, if not,

    (5)    whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. § 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *See Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994). At steps one through four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at step five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). In this case, the ALJ never reached step five because he concluded at step four that Plaintiff was able to perform work that he had done in the past. Thus, Plaintiff had the burden of proof to show that he was disabled.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Id.* Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Evidentiary conflicts, however, are for the Commissioner to resolve, not

the courts. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). This Court may neither re-weigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *See Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question. *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 500 (S.D.Tex. 2003).

**B.     Issues and Discussion**

In moving for summary judgment, Plaintiff makes two main arguments. First, he contends that the ALJ's decision is not supported by substantial evidence and is inconsistent with proper legal standards. Specifically, Plaintiff argues that the ALJ failed to base his residual functional capacity (RFC) finding on either a credible medical opinion or on reasonable inferences from other evidence in the record. Plaintiff emphasizes that, contrary to the ALJ's finding that he could perform medium work, his treating physician, Dr. Dominguez, provided assessments indicating that Plaintiff could not even perform sedentary work. Plaintiff's second argument is that the ALJ failed to follow applicable legal standards by failing to recontact his treating physician for additional evidence or clarification of his opinion concerning Plaintiff's work-related limitations. Each of these points will be discussed in the context of the standard of review explained above.

**1.     RFC Determination**

Plaintiff argues that the ALJ failed to base his RFC finding on either a credible medical opinion or reasonable inferences drawn from other evidence in the record establishing the limiting effects of Plaintiff's impairments. In making this argument, Plaintiff quotes at length from *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995). While Plaintiff is correct that *Ripley* describes the proper

14

legal standard, the undersigned disagrees with Plaintiff regarding its application on the facts of this case.

In *Ripley*, the Fifth Circuit held that in most instances, the ALJ should "request a medical source statement describing the types of work that the applicant is still capable of performing." 67 F.3d at 557. But the absence of such a statement does not, standing alone, make the record incomplete. *Id.* Where there is no medical statement as to a claimant's ability to perform work-related functions, the inquiry of the court will focus on whether the decision of the ALJ is supported by substantial evidence in the existing record. *Id.*

In the present case, the ALJ was not only presented with multiple RFC opinions by consulting physicians, but also the record itself is replete with other substantial evidence to support the ALJ's RFC determination. With regard to the consulting physicians, the first RFC assessment was completed by Dr. Daniel H. Spoor on January 21, 1999, in connection with an earlier claim submitted by the Plaintiff. (Tr. 289–96.) A second RFC assessment was completed a few weeks later on October 26, 1999, and the conclusions of that assessment were affirmed by Dr. Wiley in February 2000. (Tr. 272–80.) A third Residual Physical Functional Capacity Assessment was completed by Dr. Bonnie Blacklock on March 9, 2001. (Tr. 233–39.) These doctors all concluded—based on the medical evidence—that Plaintiff had minimal limitations and could perform work-related functions associated with medium work. Dr. Blacklock's March 2001 assessment found that Plaintiff's subjective limitations were partially credible, but despite this she determined that Plaintiff could perform medium work. The opinions of these consulting physicians support the ALJ's finding that Plaintiff retains the capacity to do medium work.

15

The ALJ's finding is further supported by medical evidence from examinations conducted by Dr. Pardo and Dr. Calvo. Dr. Pardo examined Plaintiff in December 1998. (Tr. 298-305.) Although Plaintiff complained of various ailments (including diabetes, hypertension, arthritis, headaches, dizziness, tingling hands, and gastrointestinal problems), Dr. Pardo could find nothing out of the ordinary with Plaintiff's neck, chest, lungs, heart, abdomen, lower extremities, neurology, or range of motion. Dr. Pardo concluded that Plaintiff did not suffer from any significant limitation regarding his sitting, standing, or moving about.

Dr. Calvo's examinations of Plaintiff in October 1999 and June 2001 yielded similar results. During Dr. Calvo's June 2001 examination, he found that Plaintiff's subjective complaints of pain and limitation were inconsistent. (Tr. 219–24.) Dr. Calvo specifically noted the following: (1) Plaintiff indicated that he had been blind for four hours and yet did not seek medical attention; (2) Plaintiff exhibited a disproportionate reaction of pain to slight touching; (3) he exhibited disproportionate and non-physiologic responses on Waddell's maneuver, which is consistent with a person with "symptom augmentation" (or, put more bluntly, the doctor thought that Plaintiff was faking symptoms); (4) Plaintiff said he would run for thirty minutes in order to get air when he experienced chest pain; and (5) he had not been to a doctor with regard to his diabetes in over a year. Dr. Calvo also noted that Plaintiff did not exhibit signs of edema, his ranges of motion were all normal, his muscle tone and strength were normal, and he exhibited no difficulty in dressing and undressing or in transferring to and from the examination table. (*Id.*) These medical findings by Drs. Pardo and Calvo, based on personal examination, are consistent with the opinions of the consulting physicians and clearly support the ALJ's RFC assessment.

Other evidence in support of the ALJ's determination came from Plaintiff's own testimony. (Tr. 32–40.) Plaintiff testified that he went to an adult day-care center three to four times a week for recreation, but he later contradicted himself by saying that he never left his home and was always with his mother. When asked how much weight he could lift, Plaintiff stated that he could lift fifty pounds. Only after counsel clarified the question did Plaintiff say that he had not lifted fifty pounds since he left his work in the aloe fields. Yet Plaintiff arguably contradicted himself again by stating that the day before the hearing he had picked up the lawnmower after he finished mowing the lawn (though he added that this made him dizzy and weak). Plaintiff's claim at the hearing that he could not walk very far due to pain in his neck and stomach is inconsistent with his ability to mow the lawn—not to mention his previous statement to Dr. Calvo that he runs for 30 minutes to relieve chest pain. Plaintiff's own testimony thus provides not only a basis for the ALJ's finding that Plaintiff's subjective complaints were not credible, but also further supports the ALJ's RFC determination. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (stating that an ALJ is entitled to determine credibility and weigh testimony).

Plaintiff's testimony and the medical evidence in the record from consulting and examining physicians support the ALJ's decision not to credit the opinion of Plaintiff's treating physician, Dr. Dominguez. For example, Dr. Dominguez's assessment that Plaintiff cannot walk more than half a block or lift more than 20 pounds is hard to reconcile with Plaintiff's statement to Dr. Calvo that he runs for 30 minutes as a chest pain remedy and with Plaintiff's hearing testimony that he mows the lawn and even picks up the lawnmower. In addition, as noted by the ALJ, Dr. Dominguez's own treatment records (summarized *supra* at pp. 2–7) do not provide medical support for his opinion that Plaintiff is almost completely disabled from doing any work at all, and Dr. Dominguez's two

assessments are arguably inconsistent with regard to Plaintiff's ability to stand and sit during a workday (*see supra* p. 8).[7] Perhaps most significantly, there is substantial medical evidence from the examining and consulting physicians that arguably contradicts Dr. Dominguez's opinion (as summarized above). It is the role of the ALJ – not the courts – to weigh conflicting evidence. *Brown*, 192 F.3d at 496.[8]

In sum, the opinions of the consulting physicians, the medical findings of other examining physicians, and Plaintiff's own testimony provide substantial evidence in support of the ALJ's determination of Plaintiff's RFC.

### 2. Duty to Develop the Record

Plaintiff next argues that the ALJ had a duty to obtain additional evidence or clarification from a treating physician once he concluded that the treating physician's records were inconclusive or otherwise inadequate to receive controlling weight. In support, Plaintiff quotes from *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), for the proposition that "absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician." 209 F.3d at 453.

Plaintiff is correct that the ALJ had a duty "to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley*, 67 F.3d at 557. Generally speaking, this means that the ALJ should not reject a treating physician's opinion without first recontacting the physician

---

[7] While Plaintiff argues that the inconsistencies in the doctor's assessments are not significant, this is ultimately a somewhat moot point in light of the other substantial evidence in the record.

[8] Despite Plaintiff's complaints to the contrary, the Court credits the ALJ for providing a rather extensive discussion of the medical history in his decision. This is much more helpful than the cryptic references to the medical record that are sometimes found in such decisions.

to attempt to fill any gaps in the record. *See Newton*, 209 F.3d at 457–58. Similarly, in the absence of a medical source statement describing the applicant's work-related limitations, the ALJ should "usually" request such a statement. *Ripley*, 67 F.3d at 557. But the decision to order a medical source statement or to obtain other additional evidence is discretionary. *See Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987). The critical question is "whether the decision of the ALJ is supported by substantial evidence in the existing record." *Ripley*, 67 F.3d at 557.

In this case, it is questionable whether the record contains any gaps, given the extensive medical records from examining physicians and the three RFC assessments completed by consulting physicians. In any event, as shown above, the ALJ's decision is supported by substantial evidence in the record, and thus his failure to further develop the record is not reversible error.

Moreover, remand for further development of the record is only appropriate when the plaintiff has shown prejudice. *Newton,* 209 F.3d at 458; *Brock v. Chater*, 84 F.3d 726, 728–29 (5th Cir. 1996). "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." *Newton*, 209 F.3d at 458 (quoting *Ripley*, 67 F.3d at 557). *See also Brock*, 84 F.3d at 728 (plaintiff must "show that he 'could and would have adduced evidence that might have altered the result'") (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)).

Plaintiff has made no showing of what additional evidence might have been forthcoming if the ALJ had taken steps to develop the record. Such a showing is necessary in this case since there is significant medical evidence in the record contrary to Plaintiff's position. Plaintiff's claim that

the ALJ improperly failed to develop the record thus fails for the additional reason that Plaintiff has not shown any resulting prejudice.[9]

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket No. 18) is hereby GRANTED and Plaintiff's Motion for Summary Judgment (Docket No. 17) is DENIED. Judgment will be entered in favor of the Commissioner by separate order.

DONE at McAllen, Texas on September 29, 2006.

_____
Peter E. Ormsby
UNITED STATES MAGISTRATE JUDGE

---

[9] It should also be noted that this is not a case in which special precautions were needed because the claimant was unrepresented. *See Bowling v. Shalala*, 36 F.3d 421, 437 (5th Cir. 1994) (noting heightened duty to develop the record exists where the claimant is unrepresented by counsel). To the contrary, Plaintiff pursued her application with the assistance of counsel.